CHARLES RIVER PARK, INC. *vs.* BOSTON REDEVELOPMENT
AUTHORITY.

No. 88-P-1008.

Suffolk. June 1, 1989. - July 10, 1990.

Present: BROWN, DREBEN, & FINE, JJ.

*Contract*, Sale of real estate, Performance and breach, Redevelopment of
land. *Jurisdiction*, Specific performance. *Redevelopment of Land. Pub-
lic Board. Practice, Civil*, Summary judgment.

In an action for specific performance, in which a redeveloper claimed the
    right to develop certain parcels of land within an urban renewal project,
    the record on summary judgment established that the defendant Boston
    Redevelopment Authority (BRA) validly voted to terminate the
    redeveloper's rights in the parcels, where it was undisputed that the
    redeveloper had failed to submit, pursuant to applicable provisions of a
    master leasehold agreement, plans and specifications conforming with
    the land use restrictions in the redevelopment plan for the project in
    sufficient detail to determine compliance with the requirements of the
    plan; and that, after the BRA's vote, the redeveloper did not, in a
    timely manner, either submit or offer acceptable revised plans comply-
    ing with the redevelopment plan or commit itself to relying on the origi-
    nal architect's plan for the parcels. [802-807]
A vote of the Boston Redevelopment Authority (BRA), interpreted in light
    of the principles that a public grant must be strictly construed against
    the grantee and that the BRA can act only by public vote, did not
    revive a redeveloper's rights as to certain parcels of land within an ur-
    ban renewal project, which rights the BRA had validly terminated
    some months earlier; rather, it appeared that, by its vote, the BRA de-
    termined to contract anew with the redeveloper for development of a
    portion of the land in question. [807-813]
In an action for specific performance it was held that, as matter of law,
    any contractual rights against the Boston Redevelopment Authority
    (BRA) that a redeveloper might have had in certain parcels of land had
    lapsed with the passage of time, where, in the circumstances, the BRA
    could no longer receive a substantial portion of the benefit it had bar-
    gained for and where it would be inequitable and contrary to public
    policy to hold the BRA to a project planned over twenty-five years
    before the action was commenced and intended to be completed some
    seventeen years previously. [813-816]

CIVIL ACTION commenced in the Superior Court Department on May 22, 1985.

The case was heard by *Robert J. Hallisey*, J., on a motion for summary judgment, and a question of law was reported by him.

*Saul A. Schapiro* for the defendant.

*Robert J. Muldoon, Jr.* (*David A. Guberman* with him) for the plaintiff.

*Rudolph F. Pierce, David M. Abromowitz & Rebecca J. Benson*, for Planning Office of Urban Affairs, Inc., amicus curiae, submitted a brief.

BROWN, J. In this action for specific performance, Charles River Park, Inc. ("CRP"), claims the right to develop the last remaining undeveloped parcel of land in the West End Land Assembly and Redevelopment Project, an urban renewal project. The case is before this court on a report by a judge of the Superior Court of a grant of summary judgment in favor of CRP and against the Boston Redevelopment Authority ("BRA"), the moving party. Upon review of the entire record, we conclude that the judge erred and that summary judgment should have been granted to the BRA.[1]

1. *Background.*[2] The parcel in question, now referred to as Area E, is a portion of what was originally designated as par-

---

[1]Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as matter of law. Mass.R.Civ.P. 56, 365 Mass. 824 (1974). "In considering a motion for summary judgment, the court does not 'pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decisions of facts' " but rather "should only 'determine whether a genuine issue of material fact exist[s]' " (citations omitted). *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370, cert. denied, sub nom. *Bailey* v. *Bellotti*, 459 U.S. 970 (1982). "[T]he inferences to be drawn from the underlying facts contained in [the] materials [accompanying the motion] must be viewed in the light most favorable to the party opposing the motion." *Id.* at 371. In addition, we note that "[t]he interpretation of an integrated agreement is a matter of law on which [the appellate court] is not bound by the trial judge's conclusions unless the problem of interpretation is affected by findings of fact." *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 755 (1973). *Carrigg* v. *Cordeiro*, 26 Mass. App. Ct. 611, 613-614 (1988).

[2]The parties in support of their respective motions for summary judgment made, to use the motion judge's words, "voluminous submissions of affidavits, exhibits, and memoranda." Our statement of the facts and our

cel 1E, one of seven parcels of land which CRP was to lease and develop, under a master leasehold agreement ("MLA"), executed March 2, 1960, between CRP and the BRA.[3] The land was to be developed in accordance with the West End Land Assembly and Redevelopment Plan (the "West End Plan"), first drawn up in 1956 and revised in 1959. CRP was designated developer in 1957.

Unlike the usual agreement to lease with an option to purchase, the MLA had as a primary purpose not simply an exchange of property for money but also a public goal: the redevelopment of land in an urban renewal area in accordance with a redevelopment plan drawn up by a public agency, here the BRA.

Under the schedule set out in § 204(b) of the MLA, the final two parcels, Parcels 1F and 1E, were originally scheduled for conveyance to CRP by March 7, 1964, and March 7, 1965, respectively. Various factors, however, contributed to delay in transferring these last two parcels. Two of those factors were the proposed taking of 40,000 square feet from Parcel 1F and the subsequent requests (in November, 1962, and October, 1963) by CRP, pursuant to § 801 of the MLA, to add Parcel 2[4] to Parcels 1E and 1F to offset the loss of area from Parcel 1F. According to letters sent to the BRA by CRP, those changes required a redrawing of the boundary lines of Parcels 1E and 1F and apparently necessitated revisions of the site plans for the parcels in question. As a result

decision will not be based on the affidavits or portions of affidavits struck by the judge. Additional background information concerning the West End urban renewal project can be found in *Commissioner of Dept. of Community Affairs* v. *Boston Redev. Authy.*, 362 Mass. 602 (1972).

[3]The agreement also contained an option to purchase. The purchase price set out in § 401 of the MLA was $1.35 per square foot for parcels designated for residential use. Area E contains 69,463 square feet, giving a purchase price of $93,775.05 under § 401. According to a reappraisal done for the BRA, the property as of 1985 was worth between $5,200,000 and $15,692,000.

[4]Parcel 2 had originally been designated in the West End Plan for use as an elementary school. Under § 801 of the MLA, CRP had the option to purchase a parcel designated for public use if it was not so used and was subsequently offered for sale.

of ongoing uncertainty over the boundaries of the parcels, CRP did not submit revised site plans in 1965.

In March, 1966, a new architect took the place of the original architect, whom CRP had discharged. A May, 1966, BRA status report stated that CRP had been informed that the boundaries of Parcels 1E and 1F would be revised to include the 40,000 square foot area and Parcel 2 and that CRP had been advised to prepare a new site plan for the parcels as revised. On June 11, 1968, the Boston public facilities commission voted to release Parcel 2 to the BRA for development, and the BRA board then voted, on June 20, 1968, to include Parcel 2 in Parcels 1E and 1F for development by CRP.[5]

CRP submitted revised site plans for Parcels 1E, 1F, and 2 in 1966, 1967, and 1968. None of the plans submitted, however, complied with the land use restriction (multifamily residential) for Parcels 1E and 1F set out in the West End Plan: the proposed plans submitted by CRP all included commercial and recreational as well as residential uses.[6] In October, 1967, the BRA executive director wrote Mr. Jerome Rappaport, counsel for CRP, stating that the board had instructed him to inform CRP "to comply with the land use controls in the . . . Plan with respect to Parcels 1E and 1F, namely, that these two parcels are restricted to residential use only."

On June 20, 1968, the BRA voted "to approve the preliminary plans of [CRP] . . ., subject to later review on specific variances that may be required and subject to the review of the final plans by the [d]esign [r]eview [o]ffice."[7]   At the

_____

[5] Formal amendment of the West End Plan to reflect the combination of Parcels 2, 1E, and 1F did not occur, however, until September 9, 1971.

[6] CRP argues that it could not submit plans complying with the land use restrictions for Parcel 2-1E-1F because Parcel 2 was designated for public use until 1971, when the BRA formally amended the West End Plan. We need not deal with this argument for the reason, among others, that Parcel 2 is not in dispute here. The record shows from the plans submitted that CRP did not comply with the land use restriction for Parcel 1E, of which Area E, the area in dispute, was a part.

[7] A memo dated June 20, 1968, from the BRA chief engineer to the director, stated that the plans were of a "pre-preliminary nature" but "not

same meeting, the BRA rejected a request by CRP for immediate delivery of Parcels 1E and 1F.[8]  CRP continued to submit plans with nonresidential components. On August 22, 1968, CRP's architect submitted to the BRA director of urban design two proposals for the project which included, in addition to residential towers, a five-story office building. Further plans were submitted in May, 1969.

In June, 1969, CRP submitted revised general plans for Parcels 1E, 1F, and 2. In a cover letter accompanying the June, 1969, submission which referred to the possible adoption by the BRA board of variances and revisions, CRP requested that a proposed third residential tower shown on the plans be made optional. In a letter sent to CRP in response, counsel representing the BRA requested "a clear and unequivocal answer" to the question whether CRP would agree either to construct all three residential towers within a specified time or, if not, to construct the two towers and have excluded from the land conveyed to CRP the portion allocated to the third tower. CRP's response, which could not be termed unequivocal, stated, e.g., "we obviously hope and expect to be able to build the third tower. . . . We are merely requesting the right not to go forward with it."

---

dimensioned nor in sufficient detail" to determine "the magnitude of variances" which might be required. A resolution subsequently voted by the BRA board in July, 1969, made the votes of June 20, 1968, approving (subject to later review) the preliminary plans and including Parcel 2, conditioned upon CRP's executing a proposed amendment to the MLA.

Although it is not entirely clear, the reference to "variances" appears to be a reference to Section G. 3 of the West End Plan, which permits the BRA to "vary the application of any provision of these restrictions, to a minor extent, when in its opinion the enforcement thereof would do manifest injustice . . . ."

[8]On August 8, 1968, CRP filed a suit in equity seeking immediate conveyance of Parcels 1E and 1F. In its complaint, CRP alleged that CRP had submitted "its initial proposal for apartments and garages upon Parcels 1E and 1F" as of June, 1966, and that "as of August 1, 1968, the plans and drawings [for Parcels 1E and 1F] had been substantially approved" by the BRA. The BRA's answer denied that the plans had been substantially approved and averred that the plans were "pre-preliminary" and that CRP had been asked to resubmit them in more detail. The action was dismissed by agreement in November, 1968.

On July 31, 1969, the BRA board adopted a resolution to amend the West End Plan to change the land use restrictions for Parcels 1E, 1F, and 2 to multifamily residential with complementary commercial and recreational uses, conditional upon the execution by CRP by August 15, 1969, of an attached amendment to the MLA which would have (1) set a schedule for submission of plans and commencement of construction, (2) provided that if CRP failed to construct the third residential tower it would reconvey that portion of the land to the BRA, and (3) increased the purchase price for the portion of the parcel to be used for a proposed office building. The resolution accompanying the vote noted that § 204(e) of the MLA directed that the parties make their best efforts to speed the schedule of commencement of the lease terms in order to achieve early completion; that change of circumstance had "operated to decelerate the schedule of commencement of the lease terms for . . . 1E and 1F," the change of circumstance being CRP's October, 1963, request to add Parcel 2 to Parcels 1E and 1F and the resulting negotiations with other parties; that the BRA had voted on June 20, 1968, to include Parcel 2 with 1E and 1F; that CRP's obligation to construct on Parcels 1E and 1F in accordance with the plans approved in 1960 was not implemented because of the aforementioned change in circumstance; that it was now feasible and desirable to amend the West End Plan; and that the BRA wished to proceed expeditiously based on the "concept of the preliminary plans submitted" by CRP. CRP did not execute the proposed amendment to the MLA.

On August 18, 1969, CRP again submitted proposed site plans calling for three residential towers, an office building, shops, a parking garage, and townhouses. In response, the BRA director wrote CRP on August 21 that the BRA could not approve the proposed plans because they indicated land uses for Parcels 1F and 2 not permitted under the West End Plan and because the proposed plans were not in sufficient detail to permit the BRA to determine the number and na-

ture of variances[9] from the regulations and controls in the West End Plan which might be required. The letter also referred to the BRA's insistence on the execution of the proposed amendment to the MLA to ensure, "among other things, adequate design review control . . . ."[10]

A January, 1970, letter from the BRA director to CRP referred to a proposal by CRP to submit by February 5 "a firm and detailed proposal" for Parcels 1E, 1F, and 2 for consideration by the BRA and to "accelerate development" of the parcels. On February 17, the BRA director wrote a follow-up letter stating that the BRA was still awaiting the response which had been due February 5. Mr. Rappaport, as counsel for CRP, replied in a letter, dated February 23, that the proposal was not yet ready. The BRA director sent another follow-up letter on May 13, 1970.

On June 4, 1970, the BRA board voted to authorize the director to serve formal notice on CRP that, pursuant to § 701 of the MLA, CRP was in breach of the leasehold agreement and that, if the breach was not cured within sixty days, the BRA would consider the agreement null and void. The vote stated that CRP had failed to accept delivery of certain parcels when due, had failed to submit general plans and specifications, and had failed to use its best efforts to speed the schedule of commencement of the lease terms. CRP responded by saying there had been no tender of delivery and by requesting such delivery, and subsequently sent a check to the BRA for the initial quarterly rental payment. The BRA returned the check. On August 6, 1970, the BRA board

---

[9] See note 7, *supra.*

[10] A memo from the BRA director to the board on August 28, 1969, referred to the continuing failure to resolve the essential problems of adequate design review controls, the absence of firm commencement and completion dates for the project, the need for a new purchase price for the portion of Parcel 1F for which a commercial use was proposed, and the recapture of the site of the third residential tower if it were not built. The memo recommended that a final offer be extended to CRP for a period of five days and that, if CRP failed to execute the proposed amendment to the MLA, the BRA tender delivery of Parcels 1E and 1F and obligate CRP to commence construction of the improvements approved by the BRA in 1960. The board referred the matter to its general counsel.

voted to declare CRP in default and the agreement terminated. The board also voted to commence a declaratory judgment action (filed December 9, 1970) to clear title for conveyance to another developer.

Subsequent negotiations between CRP and the BRA resulted in withdrawal of the lawsuit. CRP submitted new plans for development of the parcels, which included two residential towers, a hotel, a parking garage, an office building and low and moderate income housing for the elderly.

At a BRA board meeting on February 25, 1971, the board voted to approve the plans for two portions of Parcel 2-1E-1F, specifically excluding Area E, and to authorize execution of a lease for the approved portions on the condition that CRP sign an attached amendment to the MLA approved by the board. The amendment (which among other things set a schedule for construction) and the leases were executed on October 20, 1971. On September 9, 1971, the BRA formally amended the West End Plan (1) to reflect the combination of Parcels 2, 1E, and 1F and (2) to delete the designations "public use" for Parcel 2 and "multifamily residential" for Parcels 1E and 1F and designate instead as the use for a combined Parcel 2-1E-1F multifamily residential with complementary and accessory commercial uses.

2. *Validity of termination of MLA by BRA votes of June 4 and August 6, 1970.* CRP contends, and the motion judge agreed, that the BRA vote of August 6, 1970, terminating CRP's rights in parcels 1E, 1F, and 2, was invalid because, under § 701 of the MLA,[11] CRP could be found in default

[11]Section 701 of the MLA provides:

"Anything in this agreement to the contrary notwithstanding, in the event that the Redeveloper fails to accept delivery of possession pursuant to this agreement . . . of any of the eight delivery parcels as delivery of said parcels becomes due according to the schedule set out in [§ 204] and any such failure is not cured within sixty (60) days of written notice of such failure from the Authority, then the deposit made with the Authority by the Redeveloper pursuant to Section 207 shall be retained by the Authority as liquidated damages . . . , and neither the Redeveloper nor the Authority shall have further rights or liabilities against one another with respect to such parcel. In such event, no further parcels shall be delivered to the Redeveloper . . . ."

"only 'in the event that the Redeveloper fails to accept delivery of possession' " and that, because the BRA had not tendered delivery, CRP was not in default. See *Flynn* v. *Wallace*, 359 Mass. 711, 716 (1971)(normal requirement that vendor tender delivery to put vendee in default). Section 701 must be read, however, with § 302 of the MLA. Section 302 establishes that, as a condition precedent to delivery, the developer was required to submit to the BRA plans and specifications conforming with the land use restrictions in the West End Plan for such parcel and in sufficient detail to determine compliance with the requirements of the Plan.[12] Clearly, if this requirement was not met, the BRA was not required to tender delivery of the parcel in order to put CRP in default.[13] See *Vander Realty Co.* v. *Gabriel*, 334 Mass. 267,

---

[12]Section 302 required that plans for residential portions of the project be submitted prior to delivery of the first parcel in the Urban Renewal Project and that any proposed changes be submitted at least three months before the beginning of the lease term for the parcel in question. See Restatement (Second) of Contracts § 237 (1981).

[13]CRP's argument that submission of plans complying with the restrictions of the West End Plan is not a condition precedent to delivery must be rejected. Federal and State statutes were expressly incorporated into the MLA, requiring that the property be developed in accordance with the urban renewal plan. See MLA §§ 301(a), 306, 814; 42 U.S.C. § 1455 (1958); G. L. c. 121, § 26LL (see note 25, *infra*). See also MLA § 103, incorporating the West End Plan into the MLA.

To hold that the submission of such plans was not a condition precedent to delivery would run counter to the entire scheme and purpose of the MLA. A contract must be read as a whole, and, if possible, reasonable effect must be given to all its provisions. *King Features Syndicate, Inc.* v. *Cape Cod Bdcst. Co.*, 317 Mass. 652, 654 (1945). *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 342 (1979). In addition, it should be interpreted, if possible, so as to give effect to its general purpose. *King Features Syndicate, Inc.* v. *Cape Cod Bdcst. Co.*, *supra*. 4 Williston, Contracts § 618, at 710-711 (Jaeger 3d ed. 1961). To interpret the MLA to require the BRA to deliver a parcel without prior submission and approval of plans complying with the land use restrictions of the urban renewal plan would make possible an attempt to construct a project in total noncompliance with the urban renewal plan.

We also reject CRP's argument that, as the Housing and Home Finance Agency ("HHFA") model contract specified that submission of plans complying with the urban renewal plan was a condition precedent to conveyance, and § 701 of the MLA does not so specify, the omission from the MLA must have been deliberate. HHFA approval of the MLA indicates

271 (1956); *Richardson* v. *Parker*, 353 Mass. 764 (1968); Restatement (Second) of Contracts § 225, comment a & illustration 1 ("The nonoccurrence of the condition within [the time for its occurrence] has the . . . effect . . . of discharging the duty [subject to the condition]), § 237, comment a (1981); 6 Corbin, Contracts § 1252 (1962). See also *Costello* v. *Tasker*, 227 Mass. 220, 222-223 (1917); *Leigh* v. *Rule*, 331 Mass. 664, 668 (1954); Park, Real Estate Law § 964, at 421 (1981) (the law does not require a party to tender performance if the other party has shown he cannot or will not perform). Cf. *Mahoney* v. *Beebe*, 334 Mass. 165, 168-169 (1956).

CRP's argument that, since the proposed plans which were submitted to the BRA were not formally disapproved in writing within thirty days they should be "deemed approved" under § 302 of the MLA, and hence any condition precedent was satisfied, must also fail. Section 302 required that the "Redeveloper shall submit . . . general plans and general specifications . . . consistent with Part B (Planning Proposals) of the land assembly and redevelopment plan." The provision in § 302 that if no grounds for disapproval are given within thirty days "said plans and specifications shall be deemed approved" obviously refers to plans and specifications consistent with Part B of the land assembly and redevelopment plan. Our review of the record makes clear that none of the proposed revised plans complied with the land use restrictions for Parcel 1E in the West End Plan. From 1960 to 1971 this parcel was restricted to multifamily residential use; yet, all the proposed revised plans submitted by

---

to us that the MLA did comply with the HHFA guidelines, incorporating at least by implication the requirement that submission of plans was a condition precedent to delivery. Moreover, a contrary interpretation of the MLA could also put the BRA in violation of § 106 of its loan and grant contract with the Federal government. See 42 U.S.C. § 1455 (1958); *Brookline* v. *Brookline Redev. Authy.*, 344 Mass. 562, 571-573 (1962).

CRP also included nonconforming accessory recreational and commercial uses.[14]

CRP next argues that the BRA approval of nonconforming plans would have "simply effected a minor modification of the West End Plan," that *Commissioner of Dept. of Community Affairs* v. *Boston Redev. Authy.*, 362 Mass. 602, 618-621 (1972), recognized the BRA's right to do so, and that the BRA voted to deliver other parcels in similar situations. This argument, of course, overlooks the fact that it is the BRA's responsibility (as the *DCA* case held) to determine whether it is desirable or appropriate to amend the West End Plan and accept any proposed plans which would not otherwise be in conformity with the West End Plan. In the absence of such action by the BRA board, the various plans submitted by CRP did not comply with the West End Plan and, hence, cannot be "deemed approved."

CRP also argues that, even if submission of plans complying with the land use restrictions was a condition precedent to delivery, its original plans, drawn up in 1959 (by the architect dismissed in 1966), had been approved, and CRP had never waived its right to construct according to that plan. The BRA contends that CRP had abandoned the original plan, noting that CRP had submitted numerous proposed revised plans between 1966 and 1970. In support of its argument that it never waived its right to construct according to the original architect's plan, CRP refers to an affidavit by Mr. Rappaport, which stated: "We repeatedly informed the BRA that we would not agree to modify the MLA to our disadvantage and, if need be, we would go forward with the previously approved Gruen Plan. . . . " The statement and a similar statement in an affidavit by Theodore J. Shoolman are the only indications in the record that CRP informed the BRA that it intended to go forward on the basis of the origi-

---

[14]Since it is clear that the proposed revised plans did not comply with the land use restrictions in the West End Plan for Parcel 1E, we do not reach the question whether the plans and specifications were in sufficient detail to determine compliance with other requirements of Part B of the West End Plan.

nal architect's plan rather than any of the proposed revised site plans submitted to the BRA between 1966 and 1970. Even though these statements might otherwise raise a question of fact on this point, it appears that, ultimately, this would not affect the result because, during the sixty-day period after the BRA vote of June, 1970, to inform CRP it was in default, CRP did not notify the BRA that it wished to fall back on the original plan for Parcel 1E, even though the BRA vote, as noted above, stated as one basis for the default that CRP had failed to submit general plans and specifications.

In summary, the time for performance of the MLA was extended well beyond the originally scheduled date for completion by the implicit agreement of both parties (see *Flynn v. Wallace*, 359 Mass. at 715-716) because of uncertainty over the boundaries of Parcel 1F (resolved in 1966) and because of delays resulting from CRP's request to acquire Parcel 2, as permitted by § 801 of the MLA, and to add it to Parcels 1E and 1F. The latter factor was eliminated as a cause of delay by the June 11, 1968, Boston public facilities commission vote to release Parcel 2 and the June 20, 1968, BRA vote to include Parcel 2 in Parcels 1E and 1F for development by CRP. Given (1) the lapse of time (five years after the date scheduled for conveyance of Parcel 1E, and two years after the vote to release Parcel 2 and consolidate it with Parcels 1E and 1F, (2) the directive of § 204 of the MLA that the parties make their best efforts to speed the commencement of the lease terms to bring about an early completion of the project, (3) the requirement that construction of the project be completed within a reasonable time, and (4) CRP's repeated submissions of revised plans failing to comply with the West End Plan land use restrictions,[15]

---

[15]Because the proposed plans submitted by CRP did not comply with the land use restrictions of the West End Plan as required by the MLA, the BRA was not required to approve them. The BRA, thus, did not violate any requirement of good faith and fair dealing. See Restatement (Second) of Contracts § 205, comment d, § 225, comment b. The only requirement imposed by the MLA on the BRA in this respect was that it not unreasonably withhold its approval of changes in the land assembly and redevelop-

and then its failure to commit itself to a plan, the BRA vote in June, 1970, that CRP was in default and giving it sixty days to cure was proper under § 701 of the MLA.[16]

CRP did not submit or offer to submit acceptable revised plans complying with the West End Plan or offer to rely on the original architect's plan within the sixty days. The subsequent BRA vote of August 6, 1970, that the agreement was ended, therefore, was valid. See Restatement (Second) of Contracts § 225(2), comment a, § 237, comment a, and § 242, comment d; 6 Corbin, Contracts § 1252. See also *Tripp* v. *Smith*, 180 Mass. 122 (1901); *Leigh* v. *Rule*, 331 Mass. at 668; *Vander Realty Co.* v. *Gabriel*, 334 Mass. at 268-270; *Richardson* v. *Parker*, 353 Mass. 764; *Herrin* v. *Bouzianis*, 12 Mass. App. Ct. 904 (1981) (specific performance denied where purchaser had not satisfied condition); Park, Real Estate Law §§ 964 & 965 (1981 & Supp. 1989).

3. *The reinstatement vote.* Having concluded that the agreement as to Parcels 1E, 1F and 2 was rightfully terminated in 1970, we must now decide to what extent it was reinstated by the February 25, 1971, vote of the BRA board authorizing the lease of two portions of Parcel 2-1E-1F, Areas 2A and F. The motion judge ruled that the resolution adopted by the board reinstated, or somehow recognized the invalidity of, the termination of CRP's rights to Area E. (The text of the resolution is reproduced in full in an appendix to this opinion.) CRP does not argue that the 1971 vote reinstated CRP's rights, but rather that it "recognized CRP's right to Area E and the invalidity of the purported 1970 termination."[17]

---

ment plan needed to meet the requirements of Federal agencies or of mortgagees under conventional financing.

[16]This vote under common law principles as well made time of the essence. See *Limpus* v. *Armstrong*, 3 Mass. App. Ct. 19, 22 (1975); *Merry* v. *A. W. Perry, Inc.*, 18 Mass. App. Ct. 628, 630 (1984).

[17]The motion judge ruled that the vote of February 25, 1971, rescinded the August, 1970, vote terminating CRP's rights. He ruled that the vote was unambiguous and that it stated that Area E was "excluded from approval of the schematic site drawings, not from the vote to reinstate CRP's rights." Italicizing for emphasis, the motion judge noted that the "vote itself state[d] that 'it is the obligation of CRP, *upon delivery of Parcels 2-*

Decisions by the BRA regarding disposition of land must be made "by formal action by vote at a duly constituted meeting." *Planning Bd. of Springfield* v. *Board of Appeals of Springfield,* 338 Mass. 160, 164 (1958). *Moskow* v. *Boston Redev. Authy.,* 349 Mass. 553, 564 (1965), cert. denied, 382 U.S. 983 (1966). Moreover, it is a general rule that where a public board is required to act through votes at meetings and to keep records of its acts, the record duly kept cannot be varied or added to by other evidence. *Carbone, Inc.* v. *Kelly,* 289 Mass. 602, 605 (1935). *Selectmen of Stockbridge* v. *Monument Inn, Inc.,* 14 Mass. App. Ct. 957, 958 (1982)(permitting, however, proof of clerical error). This rule is a rule of substantive law and not a part of the law of evidence. It forbids proof of acts of the board by any evidence other than the record. *Carbone, Inc.* v. *Kelly, supra* at 605. In addition, public grants must be strictly construed against the grantee. *Prudential Ins. Co. of America* v. *Boston,* 369 Mass. 542, 547 (1976)("Nothing will be included in the grant except what is granted expressly or by clear implication"). See also *Local Div. 589, Amalgamated Transit Union* v. *Commonwealth,* 666 F.2d 618, 637 (1st Cir. 1981), cert. denied, 457 U.S. 1117 (1982).

Prior to adopting the resolution authorizing the lease of Areas 2A and F, the BRA, at the same meeting, voted to table a recommendation by the BRA director to rescind its votes of June 4 and August 6, 1970, declaring CRP in de-

---

*1E-1F by the [BRA],* to construct improvements upon said parcels.' " In the event the vote was considered ambiguous, the motion judge ruled that the conduct of the BRA, including (1) an agreement dated October 20, 1971, signed by the BRA director and CRP which contained the language "after delivery of the aforesaid Area E to [CRP]" and (2) the fact that "the BRA never declared the $100,000 security deposit to be forfeited," indicated that the vote intended to reinstate CRP's right to Area E or recognized the invalidity of the prior default vote. These two rulings were incorrect. The BRA did declare the $100,000 security deposit to be forfeited after it voted to declare CRP in default. There is no vote in the record by the BRA board authorizing the "agreement" dated October 20, 1971, referring to "delivery of the aforesaid Area E"; the "agreement," therefore, was not valid.

fault and to table the director's recommendation to withdraw its action for declaratory judgment against CRP.

The resolution which the board adopted approved schematic site drawings for Areas F and 2A (specifically excluding Area E[18]) and authorized (subject to a complete design review process) the director to execute a lease with CRP for Areas F and 2A, subject to agreement by CRP to execute an attached amendment to the MLA. Although the resolution contained in a preliminary clause the language quoted by the motion judge (see note 17, *supra*; appendix, clause [6]), the resolution itself did not reinstate any right of CRP to develop Area E or authorize further action with regard to Area E. Further, it appears that, rather than recognizing the invalidity of the prior vote terminating the contract with CRP, the board, following negotiations between the parties, voted to recontract with CRP to develop a portion of the remaining parcel pursuant to the terms of the previous MLA and a new amendment to the MLA.

A possible explanation for the language quoted by the trial judge referring to Parcels 2-1E-1F is that because of the

---

[18]CRP had proposed to put a hotel on Area E. An affidavit of Mr. Rappaport (as a general partner of CRP) states that there was concern at the BRA board meetings that the proposed hotel "might cause problems with HUD" because, "[u]nder [F]ederal law, no hotel could be built in a [F]ederal urban renewal project without what amounted to a certificate of need from HUD, and . . . City Council approval of a hotel also might be necessary. . . ." See 42 U.S.C. § 1456 (1958) (no provision allowing construction of new hotels permitted in urban renewal plan unless independent analysis shows need for additional units of transient housing); HUD Urban Renewal Handbook, RHM 7207.1, par. 2.e. (6/3/70) ("Plan changes which provide for new hotels . . . require prior HUD concurrence"). The affidavit goes on to state, "In order to put off possible problems with HUD approval of the hotel and in deference to the Board's desire to maintain some leverage over us to assure commencement of construction of the elderly housing and . . . on Area F . . . , we agreed to BRA approval of our plans, exclusive of the hotel. As the BRA knew, the parking structure for the hotel was included in the approval for 2 and 1F because it was inseparable from the residential parking and was to be included in the FHA-insured mortgage. . . . " The latter fact does not bind a future BRA board to vote to approve a change in the urban renewal plan. Compare *Labor Relations Commn.* v. *Selectmen of Dracut*, 374 Mass. 619, 621, 625-626 (1978). See generally 10A McQuillin, Municipal Corporations §29.101 (3d ed. 1990).

BRA vote in 1968 to consolidate Parcel 2 with Parcels 1E and 1F[19] and because the areas to be leased were smaller and did not coincide with the prior designations of the parcels[20] it was thought necessary to refer to Parcel 2-1E-1F for purposes of identification. In fact, the substantive portion of the resolution refers to "Areas F and 2A (Area E being specifically excluded), as shown on a Parcel Delivery Plan for Parcel 2-1E-1F." We also note that the clause quoted by the motion judge subsequently refers to approval of "a portion of" plans and specifications for the "said parcels," and the next clause (see appendix, clause [7]) refers to development "of that portion of Parcel 2-1E-1F." Section 204(d) of the MLA provided that the BRA "may . . . offer to the Redeveloper delivery of possession for lease hereunder of parcels less in area than an entire delivery parcel, but the Redeveloper need accept delivery of possession of such lesser parcels only at its option." This section thus expressly permitted conveyance of a portion of a previously designated parcel. Although CRP argues that the references to parcels 2-1E-1F in the vote and proposed MLA amendment imply that the vote recognized the right of CRP to the entire delivery parcel, it seems at least as likely, if not more likely, that the references were for the purposes of (1) designating the parcels according to the already existing scheme and (2) applying § 204(d) of the MLA which authorized delivery of a portion of a parcel.

Even if conveyance of a portion of a delivery parcel under § 204 did not necessarily automatically extinguish the right to the remainder of that parcel, given the circumstances here — the fact that the rights under this contract had previously been terminated, the requirement that the BRA must act by vote, and the rule that public grants are to be construed strictly, *Prudential Ins. Co. of America v. Boston*, 369 Mass.

---

[19]As noted previously, the BRA did not formally amend the West End Plan to combine Parcel 2 with 1E and 1F until September, 1971. (The lease for Areas 2A and F was executed in October, 1971.)

[20]Area E is only a portion of former Parcel 1E. Perhaps more to the point, Area F is comprised of all of former Parcel 1F, plus the portion of former Parcel 1E not included in Area E.

at 547, — it cannot be concluded that the above resolution of the board "expressly or by clear implication" reinstated CRP's right to Area E.[21]

CRP argues that from 1971 on the "BRA is precluded by its own admissions" from denying that the MLA committed Area E to CRP.[22] We do not agree that any of the items cited constitutes such an admission.[23] The items referred to

---

[21]As the termination vote of August 6, 1970, was valid, it is unnecessary to consider CRP's arguments that the BRA by its actions recognized the invalidity of that vote. This is because acts of the board cannot be proved by any evidence other than the record of the acts of the board at a duly constituted meeting. See *Carbone, Inc.* v. *Kelly*, 289 Mass. at 605; *Selectmen of Stockbridge* v. *Monument Inn, Inc.*, 14 Mass. App. Ct. at 958.

It should be noted also that the BRA cannot be estopped by actions of its employees. See, e.g., *Ferrante* v. *Board of Appeals of Northampton*, 345 Mass 158, 162-163 (1962); *Harrington* v. *Fall River Hous. Authy.*, 27 Mass. App. Ct. 301, 308-309 (1989). Cf. *New City Hotel Co.* v. *Alcoholic Bev. Control Commn.*, 347 Mass. 539, 542 (1964); *Phipps Prod. Corp.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. 687, 688, 693-694 (1982).

CRP also argues that, unless the 1970 termination vote was invalid, the BRA failed to comply with the requirements of the HHFA Manual, such as notifying potential developers, requiring a security deposit, and obtaining prior HHFA or HUD concurrence, before agreeing to lease Areas 2A and F to CRP. See *Brookline* v. *Brookline Redev. Authy.*, 344 Mass. 562, 572-573 (1962). Since, however, the same developer was being reinstated with regard to part of the original parcels within only six months of the termination of the contract, it is not clear whether, in these somewhat unusual circumstances, the above procedures were required. If the termination vote was valid, however, this issue goes only to the propriety of the conveyance of Areas 2A and F, not a question for decision here.

[22]Concerning the admissibility of admissions by employees, see *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass. 418, 420-423 (1988).

[23](1) The first item, a letter dated April 26, 1971, from the BRA director to the deputy commissioner of the Department of Community Affairs stated, in response to a request for a status report on the West End project, that "[five] parcels remain for disposition. However, in all cases the would-be developer or buyer is known and all disposition should be completed by the end of 1971. Parcels 1-E, 1F, 2 . . . to Charles River Park. . . . With any reasonable cooperation from Charles River Park this project could be closed out by the end of 1971." The letter was written two months after the February, 1971, vote to lease Areas 2A and F to CRP and thus is based on that vote. It refers to "the would-be developer," and, with regard to Area E, it could be based on anticipation that negotiations between the BRA and CRP regarding Area E would be successful. (CRP, as noted previously, does not argue that the February, 1971, vote rein-

are at best ambiguous. Further, since the 1971 vote cannot be varied by extrinsic evidence (see cases cited in note 21, first par., *supra*), none of the purported admissions can be considered to enlarge the scope of that vote. Thus, we need not draw inferences in favor of CRP.

Finally, nothing in *Commissioner of Dept. of Community Affairs v. Boston Redev. Authy.*, 362 Mass. 602 (or in the BRA's presentation to the Supreme Judicial Court in that case) requires the conclusion that the February, 1971, BRA vote reinstated CRP's rights to the entire parcel, including Area E, or estops the BRA from asserting the validity of the 1970 default and termination votes as CRP claims. The BRA has not asserted a contradictory position in this case to that taken in the *DCA* case (see *Elfman v. Glaser*, 313 Mass. 370, 376 [1943]; see also *Brown v. Gerstein*, 17 Mass. App. Ct. 558, 568 n.19 [1984]) — there the question was whether the approval of DCA was required for the 1971 changes in the urban renewal plan, not an issue here; whether CRP was entitled to Area E was not an issue. More

stated CRP's rights to Parcel 2-1E-1F; rather, it argues that the vote "recognized the invalidity of" the 1970 termination vote.) (2) CRP also points out that the surrenders of leases (recognizing the transfer of CRP's rights in the parcels to subsidiary companies owned by CRP) of Areas F and 2A provided that the "Authority agrees that the Redeveloper has not at any time done or suffered any act or thing whereby the aforesaid delivery of the above-described premises can be in anyway charged, affected, or encumbered." CRP interprets the provisions in the surrenders of leases as a recognition that the 1970 votes were invalid; however, the provisions more likely meant that since the February, 1971, BRA vote to convey, CRP had done nothing to impair its rights. (3) CRP also sees an admission in the certificate of completion of the West End project approved by HUD on February 25, 1977. The certificate stated, under the heading "Capital Value Imputed to Land Retained," "Area E of Parcel 2-1E-1F is covered by Master Leasehold Agreement dated March 2, 1960, with [CRP] . . . ." But it also provided in an attached agreement that "expenses . . . associated with disposing of land . . . are expected to include . . . developer selection for Area E of Parcel 2-1E-1F. . . . " The contradictory provisions in the certificate make it inconclusive as an admission. CRP contends that, because HUD's approval was conditioned on the "BRA's representation that the asset represented by the MLA with CRP for Area E would be made available to retire project debt," the BRA cannot now argue it validly terminated CRP's rights. However, this resource could be made available even if another developer were selected for Area E.

to the point, the *DCA* opinion mentions that the BRA in February, 1971, "voted to deliver parcels 2-IE and 1F with the exception of area E to CRP, and to amend the master leasehold agreement in accordance therewith." *Id.* at 607. If anything, this suggests that Area E was not included.[24]

In light of the fact that the BRA can only act by public vote and the rule that public grants must be strictly construed against the grantee, we conclude that the BRA vote of February, 1971, and its subsequent amendment to the MLA revived the rights and obligations under the MLA with regard to only two portions, Areas 2A and F, of combined parcel 2-1E-1F. A right of CRP to obtain Area E was not included in the revised and amended contract, even though the possibility of negotiations to revive such right in the future remained.

4. *Expiration of reasonable time for performance of contract.* Even if the BRA vote of February 25, 1971, could be considered to have reinstated CRP's rights to the entire parcel, including Area E, under the MLA, we would hold that any rights which CRP might have had to Area E had as matter of law lapsed by the time this lawsuit was initiated in 1985.

Title 42 U.S.C. § 1455 (1958) and G. L. c. 121, § 26LL[25] (both incorporated into the MLA by § 306), as well as § 106(H) of the loan and grant contract between the BRA and HHFA, required that leases of property by the BRA in urban renewal areas obligate the developer to begin the building of improvements within a "reasonable time." In addition,

---

[24]In summarizing the facts, the *DCA* opinion also mentions the April 26, 1971, letter from the BRA director to DCA discussed above and a letter, dated April 25, 1972, from the BRA director to DCA stating that "the parcel was committed to the developer under an agreement . . . which failed to mention any specific type of housing . . . ." *Id.* at 609. The letter, reprinted in an addendum to CRP's brief, also stated that the parcel was conveyed on October 20, 1971. Thus this letter could be seen as indicating not that Area E was committed to CRP but rather that all that the BRA vote intended was conveyance of the two portions of the combined parcel 2-1E-1F which were conveyed in October, 1971.

[25]G. L. c. 121, § 26LL, was inserted by St. 1946, c. 574, § 1, and repealed by St. 1969, c. 751, § 2. See now G. L. c. 121B, § 49.

§ G-6 of the West End Plan (incorporated into the MLA by § 103 of the MLA) provided that the purchaser or lessee must "begin and complete within a reasonable time the building or improvements required of him."

Further, even in the absence of such a specific requirement, the time for performance does not extend forever but only for a reasonable time. See *Powers, Inc.* v. *Wayside, Inc. of Falmouth*, 343 Mass. 686, 690-691 (1962); *Richardson* v. *Parker*, 353 Mass. at 764; *Stewart* v. *Lally*, 4 Mass. App. Ct. 792, 793 (1976); *Barco Urban Renewal Corp.* v. *Housing Authy. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982); Park, Real Estate Law § 891, at 348. See also 3A Corbin, Contracts § 722, at 382 (1960); 6 Corbin, Contracts § 1252, at 4, and § 1257, at 26. Cf. *Miller* v. *Campello Co-op. Bank*, 344 Mass. 76, 79-80 (1962)(court held reasonable time for performance had expired but permitted reformation of agreement and allowed limited time period for performing of reformed contract on equitable grounds).

What is a reasonable time depends on the nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances. *Radley* v. *Johnson*, 25 Mass. App. Ct. 969, 971 (1988). *Plymouth Port, Inc.* v. *Smith*, 26 Mass. App. Ct. 572, 575 (1988). See also *Barco Urban Renewal Corp.* v. *Housing Authy. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982). "Where the evidence is in dispute and open to different inferences, the question whether an act has been done within a reasonable time after the happening of a certain event is ordinarily a question of fact, but where . . . the facts are not in dispute the question becomes one of law." *Powers, Inc.* v. *Wayside, Inc. of Falmouth*, 343 Mass. 686, 691 (1962). Compare *Cataldo* v. *Zuckerman*, 20 Mass. App. Ct. 731, 743 n.20 (1985); *Flagship Cruises, Ltd.* v. *New England Merchants Natl. Bank*, 569 F. 2d 699, 702-703 (1st Cir. 1978).

Here, the purpose of the MLA was to promote "expeditious development" (*Barco Urban Renewal Corp.* v. *Housing Authy. of Atlantic City*, 674 F. 2d at 1010) of an area previously designated as substandard. In exchange for a rental

amount and an option to purchase based on 1959 values, the developer agreed to develop the land in a timely fashion and in a manner consistent with the public interest. The terms of the MLA indicate that the development was to be "expeditious." Under the delivery schedule set out in § 204(b) of the MLA, one parcel was to be delivered every twelve months; the lease term for the last parcel (Parcel 1E) was to begin twelve months after the lease term for Parcel 1F and five years after delivery of the first parcel (Parcel 1A), in 1965. MLA § 304 required that construction begin six months after commencement of the lease term of a parcel and be completed within thirty-six months.[26] Thus, under the timetable set out in the MLA the entire project was to have been completed by March, 1968.

By the time the plans of March, 1985 (on which this action for specific performance is based), were submitted and this lawsuit was commenced, twenty-five years had elapsed since the signing of the MLA, twenty years since the date originally scheduled for commencement of the lease term for Parcel 1E, seventeen years since the originally scheduled date for completion of the entire project, fourteen years since the 1971 reinstatement vote authorizing the lease of Areas F and 2A, almost fourteen years since the commencement of the lease terms for Areas F and 2A, and almost nine years since completion of construction on the last project completed, Area F. Whatever might be the definition of reasonable time, as matter of law, such time had passed by the time this action was brought.

Moreover, in light of the nature of the contract and the circumstances, it would be inequitable to hold the BRA in

---

[26]See also HHFA Urban Renewal Manual § 14-2-3, at 6 (dated 2/1/60) (providing that the time for performance of each obligation "shall not be so long as to permit procrastination by either party or to permit the developer to hold the land for speculation"); 42 U.S.C. § 1456(c)(7) (1958) (also prohibiting speculation); HUD Urban Renewal Handbook RHA 7214.1, c.2, §3, at 6 (dated 2/68; subsequent to execution of the MLA but predating the 1971 vote), prohibiting the holding of land by developers without performing in order to benefit from increments in value resulting solely from redevelopment work by others and from general market conditions.

1985 to an agreement made in 1960 when it could no longer receive a substantial portion of the benefit it bargained for, namely, the public benefit of improvements of the property over that twenty-year period, in exchange for a rental amount and option purchase price kept at low 1959 levels.[27] It also would be inequitable[28] and contrary to public policy to hold the BRA to a project planned over twenty-five years earlier, and intended to be completed some seventeen years previously, and thus deny the BRA the ability to deal with the current, changed needs of the city.[29]

[27]Further, although mere delay alone is not generally a reason for denial of specific performance, and "[m]ere increase in the value of property" ordinarily does not make an order of specific performance inequitable (Costello v. Pet, Inc., 17 Mass. App. Ct. 382, 388 [1984]), here, where the action was brought twenty years after the originally scheduled conveyance date, fourteen years after the reinstatement vote, and four years after the BRA's initial failure to approve the plans on which CRP bases this action, there was extreme delay combined with a very great increase in value, from approximately $100,000 in 1959 to between $5,000,000 and $15,000,000 in 1985. (While the increase in value may have been attributable in part to CRP's development of the West End parcels, general market conditions obviously played a large part.) This can be reason for denial of specific performance. Compare Boston & Me. R.R. v. Bartlett, 10 Gray 384, 386 (1858). See also Mansfield v. Wiles, 221 Mass. 75, 82 (1915); McCabe v. Matthews, 155 U.S. 550, 554-556 (1895); Lindgren v. Van Fleet, 112 So. 2d 881, 884 (Fla. Dist. Ct. App. 1959); Pennsylvania v. Pendleton, 480 Pa. 107, 113-115 (1978); Gaglione v. Cardi, 388 A.2d 361, 363-365 (R.I. 1978).

[28]Cf. Detroit & Ironton R.R. v. Murry, 21 Ohio App. 97, 98-101 (1925)(specific performance of contract to sell land for railroad right of way denied because route had been changed and contract price had included amount for damages which seller's other land would have suffered from construction of railroad right of way; seller directed to seek damages at law).

[29]By 1985 it was becoming apparent that affordable housing was a critical need of the city. CRP argues that the BRA did not include affordable housing as a requirement for Area E until 1986; however, by 1985 the BRA should not have been precluded from abandoning the project as no longer meeting the needs of the city and from reassessing those needs. Cf. Duggan v. Taunton, 360 Mass. 644, 651 (1971)(grounds of public policy might invalidate contract for legal services made by municipal body for unduly long period); Illinois Cent. Hosp. for Insane v. Jacksonville, 61 Ill. App. 199, 202 (1895); Long v. Duluth, 49 Minn. 280, 286-287, 289-291 (1892)(city cannot, by grant of exclusive franchise to provide waterworks system, preclude itself for thirty-year period from exercising governmental power to establish own waterworks and supply system); Flynn v. Little

We conclude that the entry of summary judgment in favor of CRP was erroneous and that summary judgment should be entered in favor of the BRA because no issue of material fact has been raised which would change that result. The judgment entered in favor of CRP is reversed, and a new judgment is to enter in favor of the BRA.[30]

*So ordered.*

APPENDIX.

Document No. 1861

Adopted at Meeting of 2/25/71

RESOLUTION OF THE BOSTON REDEVELOPMENT AUTHORITY RE: PARCELS 2-1E-1F IN THE WEST END LAND ASSEMBLY AND REDEVELOPMENT PROJECT, BOSTON, MASSACHUSETTS PROJECT NO. UR MASS. 2-3

[1] WHEREAS, the Boston Redevelopment Authority, a public body, politic and corporate, created pursuant to Massachusetts General Laws (Ter. Ed.) Chapter 121, Section QQ, and Charles River Park, Inc. executed a "Leasehold Agreement" for the West End Land Assembly and Redevelopment Project, dated March 2, 1960, with respect to Delivery Parcels 1A, 1B, 1C, 1D, 1D1, 1F and 1G within said Project; and

[2] WHEREAS, in accordance with the terms of said "Leasehold Agreement", Charles River Park, Inc., has, at its elections accepted delivery of Parcels 1A, 1B, 1C, 1D, 1D1 and 1G, by purchase of the fee title in said parcels or by lease, and

[3] WHEREAS, the development of Parcels 1E and 1F has been the subject of continuing negotiations between the Boston Redevelopment Authority, Charles River Park, Inc., and other interested parties; and

[4] WHEREAS, the Boston Redevelopment Authority, in response to the written request from Charles River Park, Inc., on June 20, 1968, further voted to include the land area of Parcel 2 within the total land area of Parcels 1E and 1F; and

---

*Falls Elec. & Water Co.*, 74 Minn. 180, 186-187 (1898); *Brenham* v. *Brenham Water Co.*, 67 Tex. 542, 551, 554-555, 560, 566 (1887).

[30]We acknowledge the brief of Mr. Laurence S. Fordham for the defendant, filed by leave of court.

[5] WHEREAS, Charles River Park, Inc., has submitted to the Boston Redevelopment Authority a set of schematic site drawings for Parcels 2-1E-1F, dated January 18, 1971, which are the subject of continuing design review by the Boston Redevelopment Authority; and

[6] WHEREAS, pursuant to Section 302 of said "Leasehold Agreement", it is the obligation of Charles River Park, Inc., upon delivery of Parcels 2-1E-1F by the Boston Redevelopment Authority, to construct improvements upon said parcels, and whereas it now becomes feasible and desirable that the Boston Redevelopment Authority vote to approve, subject to a complete design review process and approval by the Director, a portion of a new set of General Plans and Specifications for said parcels; and

[7] WHEREAS, the Boston Redevelopment Authority now desires to proceed expeditiously with the development of that portion of Parcel 2-1E-1F, pursuant to the objectives of the West End Land Assembly and Redevelopment Plan, the concept of the preliminary development plans submitted by Charles River Park, Inc., and the intent of said "Leasehold Agreement";

[8] NOW, THEREFORE, BE IT RESOLVED BY THE BOSTON REDEVELOPMENT AUTHORITY:

> THAT, subject to the Amendment to the Leasehold Agreement for the West End Project Area by and between the Boston Redevelopment Authority and Charles River Park, Inc., attached hereto, the schematic site drawings submitted by Charles River Park, Inc. for Areas F and 2A, (Area E being specifically excluded), as shown on a Parcel Delivery Plan for Parcel 2-1E-1F, prepared by the Chief Engineer of the Authority, dated February 24, 1971, are hereby approved; and, subject to a complete design review process and approval by the Director, the Director be and hereby is authorized on behalf of the Boston Redevelopment Authority to execute a formal lease with Charles River Park, Inc. for the delivery of Areas F and 2A, as shown on the aforesaid plan of the Chief Engineer of the Authority, which lease shall contain substantially the terms and conditions set forth in an amendment to Section 304 of the master "Leasehold Agreement", attached hereto, and shall be in such form as the Director deems proper and in the best interests of the Boston Redevelopment Authority. In the event that said lease with Charles River Park, Inc. is not executed for any reason, the Authority specifically reserves any and all rights it has in the project area and any and all rights it may have as against Charles River Park, Inc.