TOWN OF BROOKLINE *vs.* BROOKLINE REDEVELOPMENT
AUTHORITY
(and a companion case[1]).

Norfolk.     April 3, 4, 1962. — June 14, 1962.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Redevelopment of Land. Contract,* What constitutes, By redevelopment authority, Condition precedent.

Upon the making of a loan and grant agreement respecting a parcel of land between a town's Redevelopment Authority and the Federal agency supervising such loans and grants, compliance by the Authority with certain procedures required by letters issued by the Federal agency was, under the proper construction of the letters, a condition precedent to any obligation of the Authority to a proposed redeveloper of the parcel, and a resolution adopted by the Authority prior to such compliance, approving a "land disposition contract" between it and the proposed redeveloper and authorizing execution of the contract in behalf of the Authority "upon completion of the requirements of" the letters, created no contractual obligations.

Two BILLS IN EQUITY filed in the Superior Court on March 29, 1960, and April 1, 1960, respectively.

---

[1] Kingsbury Browne, Jr. & others *vs.* Town of Brookline & another.

The suits were heard by *Good*, J.

*Joseph J. Hurley* (*John B. Hynes* with him) for the intervener Daniel Gevinson.

*Claude B. Cross* (*John M. Reed* with him) for the Town of Brookline.

*John L. Saltonstall, Jr.* for Kingsbury Browne, Jr. & others.

*Lewis H. Weinstein* (*Laurence S. Fordham* with him) for the Brookline Redevelopment Authority.

KIRK, J. These two bills in equity were consolidated for trial. The first is brought by the Town of Brookline (the Town) seeking declaratory and injunctive relief against the Brookline Redevelopment Authority (the Authority). The second is a taxpayers' bill brought under G. L. c. 40, § 53, and G. L. c. 231A, § 6, seeking declaratory and injunctive relief against the Town and the Authority. One Gevinson was permitted to intervene in both cases.

Through various amendments to the pleadings, the alignment of the parties with respect to the subject of the litigation has materially shifted. The positions and contentions of the Authority, the Town, and the taxpayers, once mutually antagonistic, now coincide. They all now present a united front against Gevinson on the issue which lies at the heart of the only controversy which is rightly the subject for declaratory relief, namely, whether the Authority is under a contractual obligation to convey to Gevinson, the intervener, certain land in Brookline for the purposes of redevelopment.

We proceed directly to determine that issue on its merits without pausing to consider whether the issue has been presented by the proper plaintiffs. *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 329 Mass. 243, 247–248, S. C. 330 Mass. 422, 425. *Barnstable* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 343 Mass. 674, 676.

The judge resolved the issue against Gevinson who has appealed. We have before us the judge's statutory report of material facts and the exhibits. The testimony is not

reported in its entirety, but under the provisions of Rule 2 of the Rules for the Regulation of Practice before the Full Court (1952) as amended, 328 Mass. 693, portions of the testimony were designated to be printed as part of the record. We, therefore, treat the cases as before us on all the evidence (*Cohen* v. *Santoianni,* 330 Mass. 187, 190) and a report of all the material facts. "[O]ur duty is to examine the evidence and decide the case according to our own judgment, accepting the findings of the trial judge, whether based wholly or partly upon oral testimony, as true, unless they are shown to be plainly wrong, and finding for ourselves such other and additional facts as we deem to be justified by the evidence." *Hanrihan* v. *Hanrihan,* 342 Mass. 559, 564. *LeBlanc* v. *Molloy,* 335 Mass. 636, 637. *Socony Mobil Oil Co. Inc.* v. *Cottle,* 336 Mass. 192, 193.

The facts pertinent to the problem presented for decision are as follows. The Authority is a "public body politic and corporate" organized under the provisions of G. L. c. 121, § 26QQ, to carry out redevelopment projects in the town of Brookline. The Housing and Home Finance Agency (HHFA) is the Federal agency established by the Congress of the United States to supervise loans and grants made by the United States to local public agencies, such as the Authority, in furtherance of local redevelopment projects. On November 5, 1958, HHFA and the Authority entered into a Loan and Grant Agreement whereby the United States agreed to make loans to the Authority for the acquisition and clearance of the land concerned (the Farm Area) and to make a capital grant to the Authority for two thirds of the net cost of its redevelopment.[2] On April 22, 1959, the Authority acquired the Farm Area by eminent domain. On July 6, 1959, the Authority selected Gevinson as the proposed redeveloper of the Farm Area. Thereupon, counsel for the Authority and Gevinson began negotiations for the Land Disposition Contract which was to govern the conveyance of the Farm Area by the Authority to Gevinson for redevelopment.

---

[2] The remaining one third of the net cost of the redevelopment project was the subject of a Cooperation Agreement between the Authority and the Town.

Section 201 of the Loan and Grant Agreement between HHFA and the Authority provides:

"CONDITIONS PREREQUISITE TO PROJECT TEMPORARY LOAN OR PROJECT CAPITAL GRANT.

"Notwithstanding any other provisions of this Contract, the Government shall be under no obligation to make a payment on account of the Project Temporary Loan or the Project Capital Grant: . . . (12) If the Local Public Agency [the Authority] shall then be in default with respect to any of the provisions of this Contract."

Section 106 (C) of the same agreement provides: "General Requirements Concerning Land. — The Local Public Agency [the Authority] will: . . . (6) Duly observe, and conform to, all valid requirements of any governmental authority relative to Project Land [the Farm Area] which is held by the Local Public Agency as a part of the Project, and all covenants, terms and conditions applicable to Project Land so held."

HHFA requirements relative to the Farm Area held by the Authority are contained in the Local Public Agency Manual, supplemented by Local Public Agency Letters (LPA letters) issued from time to time by HHFA to the Authority.

Among the requirements so established are (a) that the Authority obtain HHFA approval of the terms and conditions of the Land Disposition Contract between the Authority and the proposed redeveloper, and (b) that the Authority follow certain procedures in connection with the execution of the approved Land Disposition Contract. Of these latter requirements, those which concern us are contained in two LPA letters issued by HHFA to the Authority.

1. LPA letter No. 84 (issued December 21, 1956) provides in pertinent part: "Land Disposition Under Non-Competitive Conditions . . .

"Prior to entering into any form of contract, memorandum of understanding, exclusive negotiating privilege, or other written evidence of agreement or understanding between the Local Public Agency and the redeveloper, the

Local Public Agency shall, at the appropriate times, submit the following documentation in duplicate to the HHFA Regional Office for its concurrence:

"1.   Resolution of the governing body of the Local Public Agency (a) specifically describing and approving the proposed method of disposition, and (b) determining that the proposed method of disposition is the most prudent method of making the land available for redevelopment (may be combined with resolution described in item 2 below).

"2.   Resolution of the governing body of the Local Public Agency approving the proposed contract, memorandum of understanding, exclusive negotiating privilege, or other proposed agreement or understanding to be entered into with or to be granted for the benefit of a redeveloper that would convey title without competition or that may contemplate or lead to a non-competitive disposition (may be combined with resolution described in item 1 above).

"3.   Proposed agreement or understanding approved by the resolution described in item 2 above.

"4.   Data and analysis on the basis of which the governing body of the Local Public Agency has determined that the proposed method of disposition is the most prudent method of making the land available for redevelopment, including the report of a consultant of the type referred to above.

"5.   Opinion of counsel of the Local Public Agency that the proposed method of disposition is permitted under State and local law and that the proposed agreement or understanding is not contrary to State or local law. . . .

"7.   Evidence of the Local Public Agency's determination as to the qualifications and financial ability of the proposed redeveloper to acquire and redevelop the land in accordance with the urban renewal or redevelopment plan, together with the data and analysis . . . on the basis of which the determination was made.

"8.   Evidence that an advertised public hearing, of the type prescribed in Part 2, Chapter 11 of the Local Public

Agency Manual for public hearings preceding land acquisition, has been held, at which the proposed agreement or understanding with or for the benefit of the redeveloper (see item 2 above) was available for examination prior to its execution. See Part 2, Chapter 11, Section 3 of the Local Public Agency Manual for documentation to be submitted. . . .

"Following review of the documentation submitted by the Local Public Agency in accordance with the above, the HHFA Regional Office will advise the Local Public Agency as to the acceptability of its proposal."

2. LPA letter No. 185 (issued September 28, 1959) provides in pertinent part: "REDEVELOPER'S STATEMENT TO BE MADE PUBLIC BY LPA. Before entering into a contract for, or understanding with respect to, each disposition of project land, a Local Public Agency, in addition to meeting existing requirements, shall:

"1. Obtain from the proposed redeveloper a Redeveloper's Statement for Public Disclosure . . ..

"2. Publish a notice containing the information set forth below[3] in at least one newspaper of general circulation in the locality at least 10 days before the date of entering into any contract or understanding with the proposed redeveloper, inclusive of the day of publication and the day of entering into the contract or understanding.

---

[3] "The notice shall contain: 1. Name, address, and office hours of the Local Public Agency. 2. Name of the project and a general description of its location. 3. Name of each redeveloper with whom the Local Public Agency then *proposes to enter into a contract or understanding* [emphasis supplied]. 4. Recital that the Local Public Agency is *considering a proposal to enter into a contract for (or understanding with respect to) the disposition of project land* [emphasis supplied] to each redeveloper named in the notice, on or after a specified date (which date shall be not earlier than 10 days after publication of the notice, inclusive of the date of publication). 5. Recital (a) that each proposed redeveloper named in the notice has filed with the Local Public Agency a statement identifying its officers and principal members, shareholders and investors, and other interested parties and, if residential redevelopment or rehabilitation is contemplated, furnishing the estimated cost of such residential redevelopment and rehabilitation and the estimated sales prices or rentals for the proposed housing involved in such redevelopment and rehabilitation, and (b) that the statement of each proposed redeveloper is available for public examination at the office of the Local Public Agency during its regular office hours."

"3. Afford all persons, so requesting, an opportunity to examine the Redeveloper's Statement for Public Disclosure.

"*An 'understanding' with respect to the disposition of land, as used . . . in this Letter, means any agreement or statement, written or oral, made by the Local Public Agency or by any person acting on its behalf, which commits the Local Public Agency in any way to sell or lease project land to a particular redeveloper*" (emphasis supplied).

On February 23, 1960, the Authority voted to send to HHFA a draft of the proposed Land Disposition Contract between it and Gevinson. On March 7, 1960, HHFA notified the Authority by letter that the Land Disposition Contract had been reviewed and stated to the Authority that the Land Disposition Contract "may be executed . . ., provided that the following changes are made therein: . . . [changes omitted]. Upon execution of the . . . [Land Disposition Contract] revised in accordance with the foregoing, please submit to this office two certified copies of . . . [it], as well as an Opinion of Counsel thereon and certified copies of resolutions by your Authority . . . authorizing execution of the . . . [Land Disposition Contract]." The changes suggested in this letter of March 7, 1960, were made by the Authority, and the Land Disposition Contract, as so amended, was resubmitted to the HHFA. On March 11, 1960, the Authority received two telegrams from HHFA. One stated in part: "Based upon the changes made in the Land Disposition Agreement which was . . . hand delivered today the comments contained in our letter of March 7, 1960, on disposition have been satisfied. . . . Walter S. Fried, Regl. Administrator HHFA [New York]." The other stated: "Confirming telephone conversation with Henry S. Halprin of this office your Authority may not execute Disposition Agreements with proposed redeveloper until compliance with . . . LPA Letter 185. You must also comply with the provisions of LPA Letter 84. Charles J. Horan, Regl. Dir. . . . HHFA [New York]."

At 5:30 P.M. of the same day (March 11), the Authority held a special meeting attended by a majority of the Authority's members and by counsel for both the Authority and Gevinson. At this meeting the above stated correspondence of March 7 and March 11 was discussed and all present were made aware of its import and significance. Thereupon the Authority passed the following pertinent resolutions:

"RESOLUTION #3 . . . WHEREAS LPA Letter #84, dated 12/21/56 and issued by the HHFA requires certain determinations, analyses, data and resolutions to be made, . . . by the Local Public Agency before HHFA will concur in a disposition by a Local Public Agency of an urban renewal project area by negotiation with a designated redeveloper under non-competitive conditions,

"Now THEREFORE, the . . . Authority resolves as follows:

"RESOLUTION #A

"WHEREAS, extensive studies of the redevelopment of The Farm area have been undertaken by this Authority and its consultant and . . . nine (9) redevelopers submitted proposals . . . and . . . at the meeting of this Authority on February 23, 1960 a proposed Land Disposition Contract . . . was approved, confirmed and ratified and thereafter submitted to the HHFA for approval, and . . . the HHFA required certain changes . . . in said contract before giving its approval . . . in a letter . . . dated March 7, 1960, and . . . the Authority has rewritten the proposed contract to comply with the said letter, and . . . the said contract as rewritten and the amended Redevelopment Plan provide for the highest and best use of the land,

"Now THEREFORE, it is hereby resolved: (a) that the disposition of The Farm Redevelopment Project be by means of a conveyance from this Authority of the fee title to said area; that such disposition be pursuant to the aforesaid Land Disposition Contract and such other corollary agreements arrived at by negotiation under non-competitive conditions as may be necessary to effectuate the terms of the aforesaid contract, and that such disposition be to Daniel Gevinson . . . and (b) it is further resolved that the aforesaid method of land disposition is in the opinion of this

Authority, . . . the most prudent, efficient and expeditious method of making the project area available for redevelopment.''

''RESOLUTION #B

'' (1) RESOLVED that since the HHFA has approved the rewritten Land Disposition Contract referred to in Resolution #A hereof, that this Authority therefore does hereby approve and adopt said contract, a copy of which is annexed hereto.''

''RESOLUTION #E

''That the Executive Director . . . is authorized to advertise forthwith . . . a NOTICE of PUBLIC HEARING . . . prescribed in . . . Letter #84 . . . provided that the Executive Director shall not so act without the approval of HHFA''; . . . and he . . . is authorized to insert forthwith in the Boston Daily Globe, the public notice as required by LPA Letter #185 . . . provided that the Executive Director shall not so act without the approval of HHFA.''

''RESOLUTION #6

''. . . RESOLVED by the . . . Authority that: (a) The Land Disposition Contract, . . . heretofore negotiated by the Authority and the redeveloper, Daniel Gevinson, . . . and modified to conform to the requirements of HHFA as set forth in its two letters of March 7, 1960, . . . is hereby approved, confirmed and ratified, and upon completion of the requirements of LPA Letter #84 and #185 and Section 407 of the Housing Act of 1959, the Executive Director of this Authority or any member thereof or its designee, is hereby authorized and directed to execute said contract in the name of and behalf of this Authority.''

The parties do not dispute the fact (and it is apparent from the resolutions themselves) that when these resolutions were passed the Authority had not complied with the requirements of LPA letters Nos. 84 and 185.[4]   It is, never-

---

[4] The notices required by these LPA letters were published on March 12, 1960, and republished on March 15, 1960.   The public hearing required by LPA letter No. 84 was held on March 26, 1960.   Subsequently, the required documentary evidence of compliance was submitted to HHFA and on May 18, 1960, HHFA notified the Authority that it was satisfied that LPA letters Nos. 84 and 185 had been complied with.

theless, the contention of Gevinson that these resolutions, specifically resolution No. 6, constituted a promise to him by the Authority presently to be bound by the terms of, and subsequently to execute formally, the Land Disposition Contract attached to the resolutions, subject only to compliance by the Authority with the requirements of LPA letters Nos. 84 and 185, which compliance was to be a condition subsequent and not precedent to the contractual obligation assumed by the Authority. The judge found in substance that this was not the intent of the Authority in passing the resolutions, that such a construction could not reasonably be given to the resolutions of March 11, 1960, by Gevinson but rather, that "the parties intended . . . that the requirements of LPA Letters #84 and #185 . . . would be satisfied before either party would become obligated in any way."

We agree.

Both LPA letters explicitly prohibit a Local Public Agency from committing itself by contract to convey redevelopment land to a proposed redeveloper before compliance with the procedures prescribed in those letters. Compliance with those procedures was therefore made an express condition precedent to any form of contractual commitment by the Authority to Gevinson with respect to the conveyance of the Farm Area[5] for redevelopment.

Moreover, the implications of the specific requirements of the LPA letters are to the same effect. Throughout LPA letter No. 84 the Land Disposition Contract is referred to as the "proposed agreement." The required public hearing is one "at which the proposed agreement or under-

---

[5] Gevinson has contended that HHFA by its letter of March 7, 1960, wherein it stated that the Land Disposition Contract "may be executed" after the making of certain changes, constituted consent by HHFA to the Authority's execution of the contract, after the changes were made, without compliance with LPA letters Nos. 84 and 185. This contention, however, is flatly contradicted by the HHFA telegram to the Authority on March 11, 1960, reminding the Authority of the necessity of compliance with those letters. It is apparent that the language of the HHFA letter of March 7, 1960, has reference only to the requirement of approval by HHFA of the terms of the Land Disposition Contract and did not constitute a waiver by HHFA of the additional and distinct requirements of the LPA letters.

standing with or for the benefit of the redeveloper . . . was available for examination prior to its execution.'' Similarly, LPA letter No. 185 speaks of the redeveloper as the "proposed redeveloper" and the required notice is to contain a recital that the Authority "is considering a proposal to enter into a contract for (or understanding with respect to) the disposition of project land.''

Finally, the design of both letters contemplates that there be no contract between the Authority and the redeveloper until the completion of the steps prescribed. One of the purposes of the public hearing on the Land Disposition Contract under LPA letter No. 84 is to give interested members of the public opportunity to make objections, and suggest changes, to the terms and conditions of the contract proposed. Similarly, the requirement of LPA letter No. 185 that the Redeveloper's Statement for Public Disclosure be available to the public before "entering into any contract or understanding with the proposed redeveloper" obviously contemplates the possibility that interested members of the public may, for various reasons, object to the proposed redeveloper himself and urge the Authority not to award the project to him. If the Authority is unable, because of prior contractual commitment, to consider and act upon such objections and changes, no matter how prudent, the requirements of a public hearing and public disclosure become empty forms.

We think, therefore, that the prior contractual commitment by the Authority contended for by Gevinson would contravene both the language and spirit of LPA letters Nos. 84 and 185.[6] This, in turn, would constitute default by

[6] Gevinson has argued that LPA letter No. 185 is not applicable because the Federal statute (73 Stat. 673, 42 U. S. C. § 1455 [e] [Supp. II 1959–1960]) directing that provisions for public disclosure by the redeveloper be included in the Loan and Grant Agreement was enacted subsequent to the execution of the Loan and Grant Agreement. As stated above, however, the Authority, by virtue of § 106 (c) (6) of the Loan and Grant Agreement, was required to comply with all valid requirements established by the HHFA with respect to land held by the Authority for redevelopment. The fact that it may not have been mandatory that HHFA require the Authority to comply with the provisions of LPA letter No. 185 does not render impermissible such requirement, as was in fact made by HHFA. In any event, the decisive factor here is that, as Gevinson knew, the Authority believed that LPA letter No. 185 was applicable and acted in accordance with that belief.

the Authority of its Loan and Grant Agreement with the United States without whose aid the redevelopment project was not financially feasible. It would be quite unreasonable for Gevinson to think that the Authority would, after prolonged and arduous preparatory negotiations, subject the project to such a risk, especially when there was no apparent concomitant advantage enuring to the Authority by the prior commitment for which Gevinson contends. In these circumstances we think the judge was amply justified in finding that the Authority's resolutions of March 11, 1960, did not create a contractual obligation but that, rather, both the Authority and Gevinson understood that neither would be bound until compliance by the Authority with the requirements of LPA letters Nos. 84 and 185.

The view which we take of the case makes it unnecessary to consider other grounds which would sustain the decrees. We have considered Gevinson's other allegations of error with respect to the final decrees and various interlocutory decrees. We are satisfied that they would not cause us to reach a different conclusion.

*Interlocutory decrees affirmed.*
*Final decrees affirmed.*