Welch, J.
INTRODUCTION
On the historic waterfront in downtown Newbuiyport, Massachusetts sits a large parcel of land owned by the Newburyport Redevelopment Authority. The parcel has sat undeveloped for years and for over a decade this land has been the subject of spirited public debate. This law suit concerns, among other things, whether the defendant has a binding contract to purchase this land. This court concludes that no legally binding contract exists.
UNDISPUTED FACTS
The Newburyport Redevelopment Authority, created pursuant to Mass. G.L.c. 121, §26(q) and G.L.c. 12 ID, §9, acquired this parcel as a result of the federal Newburyport Central Business Urban Renewal Project. See 42 U.S.C. §§1455, 1456(h), 1460(d).[1] The Newburyport Redevelopment Authority (“NRA”) acquired the parcel by entering into a contract with the United States, acting through the Housing and Urban Development Agency. As part of this urban renewal project, land was taken by eminent domain and then administered by the NRA. Various federal regulations and procedures governed the Redevelopment Authority’s administration of this project. Many of those guidelines and procedures are found in what is termed the HUD handbook (entitled Land Marketing and Redevelopment Urban Renewal Handbook, 7214.1 rev., dated August 1974). See 24 CFR 5500, 3 (regulation establishing that HUD handbook policies and procedures are applicable for urban renewal projects). See also Mass. G.L.c. 121B, §49(d) (requiring that redevelopments of land and urban renewal projects comply with the requirements of federal legislation and regulations under which loans and grants have been made). This urban renewal project in Newbuiyport was heavily subsidized by the federal government. In order to recoup some of the federal funds expended, 42 U.S.C., § 1460(c)(4) requires the NRA to sell land to redevelopers at the “fair re-use value.” This value is defined as the “fair market value of the property for its highest and best uses permitted under the urban renewal law.” See HUD Handbook §4(b).
In early 1988, after a competitive bid process,[2] the Newburyport Redevelopment Authority designated the predecessor to the defendant, then known as Foster Properties, Limited, as the redeveloper of this parcel.[3] Shortly thereafter, the NRA and Foster Properties entered into a letter of intent (drafted by the developer) stating the joint intention of the Redevelopment Authority to sell or lease to Foster Properties the parcel for redevelopment. The initial letter of intent, dated March 10, 1988, set forth that the proposed developer Foster intended to develop the parcel as a hotel project. The proposed developer specifically agreed that any sales price for the parcel “was to be determined by the Authority in accordance with HUD guidelines relating to the sale of land within urban renewal areas.” The letter of intent stated that Foster would agree to execute a land disposition agreement in a form acceptable to the Authority within 30 days of submitting the “final financial program” (this included a construction mortgage commitment and other financial details). This initial letter of intent was accompanied with a good faith deposit in the amount of $25,000 cash. This deposit was returnable if Foster used his good faith efforts and was still unable to comply with the requirements of the development. See Exhibit 3 to Plaintiffs Appendix. The deposit was returned to Mr. Foster on July 26, 1990 after he provided evidence of expenditures on this project that exceeded the deposited amount. Exhibit 8 to Plaintiffs Appendix in Opposition to Defendant’s Motion for Summary Judgment (hereafter 2nd Appendix).
This letter of intent was amended on three later occasions. It is only the last amendment of the letter of intent (termed the “fourth amendment of letter of intent") that is of any consequence to this proceeding. The fourth amendment contained provisions relating to the purchase of some additional land, the lease of certain areas for parking, an alteration of the development schedule, and a provision that allowed the defendant developer to execute a contract for the purchase of the land prior to actually obtaining a final financial commitment. This last change allowed the developer to purchase the parcel if it furnished the Authority reasonable evidence that the execution of the contract was necessary to advance the proposed *684 developer’s negotiations with potential additional limited partnership investors or potential mortgagees and the proposed developer had sufficient financial capacity to reasonably expect to obtain mortgage commitments for the development of the project.
The fourth amendment to the letter of intent included as an exhibit the proposed contract for the sale of the parcel to the developer. The proposed contract did not list a specific price for the parcel. The amended letter of intent, however, anticipated that the price might not be definitively established by the time of the contract and stated that, if this was the case, the price would be determined by reference to the HUD Handbook which established appraisal guidelines for the property (ie. the “fair re-use value of the parcel”). Those appraisal procedures are detailed. They require two appraisals and review by another qualified appraiser. See Chapter 3, ¶¶23 and 33 of HUD handbook. The fourth amendment included the provision that “the parties further agree that the fair re-use value as determined by the review appraiser shall be the purchase price of the parcel and shall be inserted into §1 as Part I of the contract.”
What is peculiar is that the proposed contract attached as Exhibit C to the fourth amendment of the letter of intent contained a rider (particularly paragraph 2.06 of the rider) that adjusted this purchase price dramatically. Once one strips away much flotsam and jetsam, it is this price adjustment that lies at the heart of this controversy. This rider appears contrary to the actual language of the fourth amendment of the letter of intent. Paragraph 2.06 of the rider sets forth that the purchase price would be determined by an assessment of the property as it “was fully permitted for improvements under applicable local, state and federal regulations ...” and then provided a substantial credit to the proposed developer for any costs that the developer incurred in legal fees, architectural fees, engineering fees, permitting costs and other matters necessary to satisfy various state and local environmental, archaeological, and zoning matters. This credit was anticipated to be substantial in that it was limited by a provision that the credit was not to exceed a total of 70 percent of the purchase price.
On the same day that this fourth amendment to the letter of intent was signed (March 8, 1990), it was assigned by the Foster Properties Limited to the current defendant Newburyport Inn Limited Partnership.[4] Within approximately a month, the proposed developer requested (pursuant to the terms of the fourth amendment of the letter of intent) that the contract for the sale of land be entered into due to the fact that the proposed developer had procured (as of January 11, 1990) a letter from a bank indicating that it would be interested in financing at least a portion of the project if there was a firm and binding land disposition agreement (ie. a contract to sell the land). Thereafter (on April 12, 1990) the Newburyport Redevelopment Authority voted to enter into the proposed contract. The signed contract is identical to the copy of the contract which had been incorporated as an exhibit to the fourth amendment to the letter of intent. Thus, the signed contract, on page three, left blank the space in which the purchase price for the property was to be inserted. In that section of the contract— designated “Sale: Purchase Price” — there is no reference to any other portion of the contract. See Exhibit 29 to Defendant’s Compendium of Exhibits.[5] Nor does the contract include a method by which a firm purchase price would be established at a later date. The contract, however, did contain the provision in the rider (ie. paragraph 2.06) that provided for an adjustment to the purchase price. Oddly enough, the contract did not include the provision from the fourth amendment to the letter of intent that set forth the proposed method to perform the land appraisal in the event that a firm purchase price could not be established at the date of entering the contract. Making matters a bit dicier was the fact that the letter of intent provided that all provisions of the letter of intent would be superseded by any eventual contract to sell the land. See Exhibit 11 to Defendant’s Compendium (page 9). And to confuse matters just a bit more, the provision in the fourth amendment to the letter of intent which set forth the HUD approved appraisal method was, if not contradicted by, at least significantly modified by the adjustment to the purchase price provisions contained in paragraph 2.06 of the rider to the contract to purchase the land.
The parties to this agreement, particularly the designated developer, must be considered experienced and sophisticated. At all times the parties were represented by counsel. The developer drafted the letter of intent and its amendments. The developer also drafted the proposed contract for sale of the land. When providing the proposed contract for sale of the parcel, the developer’s counsel noted that “the enclosed agreement is not the precise form printed and distributed by HUD. However, it has been my experience in many other similar projects that the HUD form of land disposition agreement is cumbersome and inappropriate.” See Exhibit 1 to Plaintiffs 2nd Appendix.[6] As earlier mentioned, these changes to the “precise form printed and distributed by HUD” (not to mention, required by HUD) constituted substantive revisions, particularly the provision relating to adjustment of the purchase price which was very favorable to the developer. No one disputes that the parties were fully aware that the HUD Urban Renewal Handbook required that standard HUD approved forms be used for such a land disposition contract. Any substantive modifications to the standard form required HUD’s advanced concurrence. There is no dispute in this case that HUD did not concur in advance to the changes in the HUD standard form contract prior to its execution by the parties on April 12, 1990. Approval by HUD was a *685 mandatory provision. See HUD Urban Renewal Handbook chapter 4, ¶43(5) (p. 22).
Soon after the agreement was signed by the parties, sometime in late May of 1990, the parties learned that HUD would not approve the substantive alterations proposed by the developer and agreed to by the Redevelopment Authority. See letter of Nancy LaPlante dated June 11, 1990 (Exhibit 7 to Plaintiffs Appendix). HUD’s major disagreement with the Redevelopment Authority and the developer was that the method of determining the purchase price was too favorable to the developer. As the parties understood from a meeting at HUD’s offices on May 29, 1990, HUD’s position was that any costs involved in connection with the obtaining zoning permits for the development, and related matters, probably could not be deducted from the appraisal price unless the Newburyport Redevelopment Authority could show that it had retained control over such expenditures. See letter of Hugh J. Doyle (attorney for Newburyport Redevelopment Authority) dated July 12, 1990 (Exhibit 34 to Defendant’s Compendium).
In response to this initial negative reaction by HUD, the proposed developer drafted a letter which attempted to justify the favorable price arrangement. The developer proposed that this letter be iyped on the letterhead of the Newburyport Redevelopment Authority and signed by the Newburyport Redevelopment Authority and sent to HUD. See Plaintiffs Appendix, Exhibit 9. Showing the then close working relationship between the Redevelopment Authority and the proposed developer, the Redevelopment Authority acceded to the developer’s request and the chairperson of the Redevelopment Authority signed and sent the letter (dated October 4, 1990) under the Newburyport Redevelopment Authority’s letterhead. See Exhibit 8 to Plaintiffs Appendix. Apparently sensing that its arguments would not be persuasive to HUD, the Redevelopment Authority’s counsel informed HUD (in the cover letter which attached the letter of justification) that the Redevelopment Authority was “presently discussing with the Redeveloper an amendment to paragraph 2.06 of the rider . . .” Counsel promised that “when this amendatory language is finalized, it will be forwarded to you for your review.” See Letter of Attorney Hugh J. Doyle dated October 5,1990 (Exhibit 8 to Plaintiffs Appendix).
As anticipated, HUD flatly rejected the Redevelopment Authority’s October 4, 1990 justification for the favorable purchase price. HUD noted that the Redevelopment Authority had already indicated that the development parcels would be reappraised and “that negotiations with the developer about modifications to the LDA (i.e. the contract to sell land) are underway.” HUD went on to specifically reject the position of both the NRA and the developer that costs associated with obtaining licenses pursuant to the MEPA process, special permits and variance requirements of the Newburyport Zoning Board, and Mass. G.L.c. 21E could be deducted from the appraised “fair re-use value.” HUD stated that “although we recognize that the some or all of these requirements can be time consuming and costly to a developer, you have not indicated specific instances where these requirements are unique to the Urban Renewal project and that would not otherwise be encountered in a private transaction.” The letter concludes that: “We understand that the Authority is renegotiating the terms and conditions of the LDA and will submit it for HUD review in the near future ... in the interim please note that the LDA as presently constituted is unacceptable to HUD.” See letter of Nancy LaPlante dated November 6, 1990 (Exhibit 10 to Plaintiffs Appendix). There is no dispute that the developer was fully aware of HUD’s rejection of the land contract. Exhibit 3 to Plaintiffs 2nd Appendix (November 5, 1990 Letter to Defendant’s counsel enclosing LaPlante letter).
HUD’s rejection was not surprising given that the HUD Urban Renewal Handbook sets forth that the minimum price to be paid by the redeveloper is the “fair re-use value” and that such fair re-use value “shall reflect both the advantages created by the project and the requirements and limitations on land uses to be imposed on the redeveloper by the Urban Renewal plan.” See chapter 3, par. 22 of HUD Handbook (Exhibit 2 to Redevelopment Authority’s Appendix). Likewise, the handbook emphasizes (par. 34) that the appraisal to determine the fair re-use value is to be the current appraisal “at the time of the disposal” of the property.[7] Thus, it is not surprising that HUD rejected the proposal that the developer be credited for all expenses incurred in obtaining the necessary environmental, archaeological and zoning approvals that were necessarily components of the current value of the property and reflected the “advantages created by the project.”
As promised to HUD, the parties went about attempting to renegotiate the price provision for the land. The Redevelopment Authority proposed an amendment to the language to paragraph 2.06 of the contract rider. See Exhibits 41 and 44 to the Defendant’s Compendium of Exhibits. This amendment proposed to appraise the parcel in accordance with the HUD guidelines but then added the following paragraph: ‘The property shall be appraised on an ‘as is’ basis at its fair re-use value. Such appraisal valuation shall not include any value attributable to the property as a result of the granting of zoning variances or special permits.” This proposed language was approved by the Redevelopment Authority on October 4 and then forwarded to the defendant on October 5, 1990. This newly proposed language appears to be contrary to the HUD Handbook which requires an appraisal of the current value at the time of disposal (remembering that the zoning variances and special permits had already been granted) and is directly *686 contrary to the understanding set forth by HUD in its (albeit later) November 6, 1990 letter. At the next meeting of the Redevelopment Authority, the developer submitted a letter to the Redevelopment Authority which largely adopted the language proposed by the Authority but went farther to stress that any such appraisal shall be an “as is” appraisal which “shall not include any value attributable to the property as a result of the granting of zoning variances, special permits or any other actions by the redeveloper." See Exhibit 45 to defendant’s compendium of exhibits (emphasis supplied). This additional language was not defined. The developer requested that the Redevelopment Authority pass a resolution adopting its proposed language.[8]
By the time of the October 11, 1990 meeting, the mayor of Newbuiyport had weighed in indicating a strong opposition to the proposed contract. One of the mayor’s complaints was that the proposed purchase price (which reflected credits to the developer for pursuing relief from various zoning requirements, and other environmental requirements) was favorable to the developer and contrary to the public good. See letter of Mayor Peter Matthews dated June 22, 1990 (Exhibit 32 to defendant’s compendium of exhibits). The Regional Administrator to HUD responded to the mayor’s letter again stating that HUD did not accept the proposed changes to the standard HUD land disposition contract. The Regional Administrator again noted that HUD regulations require approval of any substantive modification to a land disposition contract prior to its execution. The letter also notes that “this procedure was not followed for this agreement and rider. Consequently, unless the agreement can be made acceptable to HUD, the City of Newbuiyport is potentially liable for any shortfall and disposition proceeds owed HUD as a result of the unauthorized changes to this disposition agreement.” See letter of David Forsberg, August 1, 1990 (Exhibit 36 to defendant’s compendium of exhibits).
The Newbuiyport Redevelopment Authority did not approve the proposed amendment to the purchase price provision which had been suggested by the developer at the October 11, 1990 meeting. The Newbuiyport Redevelopment chairperson appointed herself and another member to meet with Attorney Doyle (the now former counsel to the Authority), the developer, the City Solicitor, and other interested city officials “to work out needed corrections to the LDA language, and to make recommendations to the NRA.” See Exhibit 46 (minutes of NRA dated October 11, 1990) to defendant’s compendium of exhibits. The matter still was not resolved at the next meeting of the Newburyport Redevelopment Authority on November 8, 1990. See Exhibit 49 to defendant’s compendium of exhibits. A discussion of the land contract occurred and counsel was asked to “review the proposed changes in preparation for further discussion.” At no time did the parties execute an amended contract or reduce any new appraisal method to writing.
Any subsequent negotiations to resolve the unfinished business of determining an appropriate method of obtaining a purchase price were apparently not held or, at least, were not fruitful. While this process was ongoing, matters concerning the Newbuiyport Urban Redevelopment were proceeding on a different — perhaps higher — plane. On November 28, 1990, the United States Congress passed the Cranston-Gonzalez National Affordable Housing Act. Section 918 of that Act, particularly subparagraph (g), provided that Newbuiyport (and two other cities in Massachusetts) were entitled to retain “any categorical settlement grant funds or urban renewal grant funds that remain after financial close out of the Central Business Urban Redevelopment project.” Any such surplus funds were to be used in accordance with the requirements of the Community Development Block Grant Program. This enactment had at least one practical aspect. This piece of legislation meant the City could retain any net proceeds from the sale of the urban renewal parcels and was no longer obligated to pay over any surplus to HUD. See Exhibits 50, 54 and 55 of Defendant’s Compendium. As a result of this federal legislation, HUD no longer has a financial interest in any Urban Renewal project in Newburyport. As a matter of federal urban redevelopment law, it is unclear whether any further contract entered into between the proposed developer and the Newbuiyport Redevelopment Authority would need to be approved by HUD. See 2nd Affidavit of Robert Paquin.
LEGAL DISCUSSION
The Newburyport Redevelopment Authority seeks a declaratoiy judgment that the April 12, 1990 contract to sell land is not valid or binding. In a mirror image claim, the defendant Newbuiyport and Limited Partnership has filed a cross motion for summary judgment seeking a determination that this contract is binding upon the parties.[9]
Despite a fair amount of sound and fury, the parties agree that there exist no genuinely disputed issues of material fact as to the issue of the validity of the April 12, 1990 contract.[10] The parties certainly draw different inferences from various exhibits and other verified matters, but the underlying facts do not appear to be in dispute. Thus, it appears appropriate to resolve the motion and the cross-motion for summary judgment regarding the validity of the April 12, 1990 contract. The plaintiff makes a variety of arguments as to why the contract is invalid. These grounds include a failure to comply with the statute of frauds in that a specific price figure is not mentioned in the contract. In addition, the plaintiff contends that the contract does not contain an adequately specific date of performance. The plaintiff also argues that, even if the defendant had enforceable rights under the contract, those rights have lapsed due to the defendant’s delay in developing *687 the parcel and the failure to obtain HUD approval for a delay over eighteen months. This Court need not address these particular arguments.
Instead, the plaintiffs strongest argument is the one on which it -wins. That argument is, simply put, that the parties did not have a meeting of the minds as to a critical component of the contract. That critical component was the price — or the method of determining the price — of the parcel. Although the defendant may or may not have other legally enforceable rights, this is a fatal flaw in the contract. Thus the April 12, 1990 contract is not enforceable and conveys no legally enforceable rights to either pariy.
The fact that the April 12, 1990 contract did not set forth a specific price for the parcel, of course, does not render it invalid. Instead, it would be sufficient if the parties agreed in writing that a specific method would be utilized to determine the purchase price at a later date. This is true even if the specified formulae and procedure are contingent on future events. Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509, 517-18 (1998) (upholding contract that specified precise method of appraisal). The present contract, unlike the agreement upheld in Lafayette Place, did not specify the appraisal procedure “that would determine the price under the several contingencies.” Id. at 516. Instead, the only reference to the price is that some unspecified appraisals will be performed on the basis that the parcel “was fully permitted for improvements” and then a credit is to be applied for the developer. This procedure is set forth in paragraph 2.06 of the contract rider and does not specify the appraisal method with any degree of precision. Compare Lafayette Place, supra. Given the lack of any information as to the method or number of appraisals, this contract does not easily fit into Justice Holmes’s metaphor of machineiy that is built and merely needs to be set into motion. Id. at 519, citing Drummond v. Crane, 159 Mass. 577, 579 (1893).
The defendant’s response is that the parties plainly intended to incorporate the appraisal method set forth in the Fourth Amendment to the letter of intent lie. paragraph 16 of that letter stating the unremarkable proposition that the appraisal method set forth in the HUD Handbook for determining “fair reuse value” shall apply). The defendant also asserts the unassailable argument that a series of writings may satisfy the statute of frauds. This response, however, is a bit too facile when one remembers that the (never modified) provision of the letter of intent (paragraph 7) specified that the land contract would supersede the letter of intent in its entity.
Still, a contract should be interpreted “so as to make it a valid and enforceable undertaking rather than one of no force and effect.” Shayeb v. Holland, 321 Mass. 429, 431 (1947). Given the context of the April 12, 1990 contract, one might fairly assume that the term “appraisals” used in paragraph 2.06 of the Rider refers to the appraisal method specified in the HUD Handbook. This is because the contract is written against the backdrop of all the requirements set forth in that HUD Handbook. If one reads the contract as incorporating the HUD Handbook method of appraisal for the “fair re-use value,” the methodology for determining a purchase price is sufficiently definite. The problem, therefore, is not one of the statute of frauds. The problem instead relates to the fact that the contract was not binding unless it was approved by HUD. From the first letter of intent, the parties agreed that they are bound by the HUD regulations, contained in the handbook, and that any sale must be in accordance with those regulations. The HUD Handbook makes it clear that any substantive amendments to a land disposition agreement must be approved by HUD prior to the execution of the agreement. The Supreme Judicial Court recently has stressed that such G.L.c. 121B urban renewal projects as this involve significant public monies and, thus, are subject to stringent public approval mechanisms by both local and federal agencies. St. Botolph Citizens Comm., Inc. v. Boston Redevelopment Authority, 429 Mass. 1, 11 (1999). The parties’ actions in attempting to obtain HUD agreement and then attempting to renegotiate the rejected price provision are fully in accordance with that understanding that HUD approval was necessary before the contract would be legally binding. All the parties were sophisticated and realized that they had strayed from the approved standard form contract required by HUD. Of course, the defendant cannot have the benefit of incorporating the land disposition appraisal provisions of the HUD handbook, but not the land disposition approval provisions. The salt comes with the sugar. To paraphrase Justice Fried’s opinion in Lafayette Place: “it is the other side of this same coin that the procedures necessary to lend specificity to what at the outset is not entirely specific are an integral part of the agreement . . . and, if a party does not follow those procedures, it should not be able to claim” the existence of a binding agreement. 427 Mass, at 516.
The developer suggested alternative language for the developer’s benefit. HUD, and others, found that this proposed change to the standard HUD contract was too favorable to the developer and HUD rejected the proposed amendment. The developer and counsel for the Redevelopment Authority quickly proposed an alternative to sec. 2.06 of the contract rider. This amendment, however, was never approved by the Redevelopment Authoriiy.[11]
The defendant vigorously contests the court’s conclusion that the parties failed to agree upon amended language to replace the challenged paragraph 2.06. But there is little weight to this argument. The Newburyport Redevelopment Authority did pass a resolution proposing alternative language for the method of appraisal. The defendant, pushing the NRA a bit fur *688 ther, responded with a request that “the board pass a resolution” adopting an “as is” appraisal which was not to include value attributable to the property not only for zoning variances and special permits obtained, but also for “any other actions of the redeveloper.” This additional language would include the not inconsiderable costs of obtaining licensing under the Massachusetts Environmental Protection Act, G.L.c. 91, Conservation Board approval, state and local approvals relating to historic preservation and archeological matters and G.L.c. 21E. All of these matters were described as involving “substantial sums of money.” Exhibit 8, Plaintiffs appendix. This additional language appears to be an attempt by the developer to obtain all the benefits of the rejected paragraph 2.06 by simply rephrasing the language. In any event, the Redevelopment Authority never passed the requested resolution. Instead, the NRA merely appointed a subcommittee to meet with the developer and other city officials “to work out needed correction in the LDA language, and to make recommendations to the NRA.” Exhibit 46 to Defendant’s Compendium (NRA Oct. 11, 1990 minutes). Shortly after this inconclusive meeting the parties received word that HUD would not approve any appraisal method that gave the developer credit for obtaining such MEPA, ch. 2 IE, or zoning approvals. Exhibit 3 to Plaintiffs 2d Appendix. At its next meeting, the NRA chair reported that no negotiations had yet taken place with the developer and the developer announced a willingness to renegotiate “provided that all issues are dealt with at the same time rather than piecemeal ...” Exhibit 49 to Defendant’s Compendium. Negotiations did not proceed further. Decisions by a redevelopment authority disposing of land must be made “by formal action by vote and a duly constituted meeting.” Charles River Park, Inc. v. Boston Redevelopment Authority, supra at 808. Furthermore, “public grants must be strictly construed against the grantee.” Id., citing Prudential Ins. Co. of America v. Boston, 369 Mass. 542, 547 (1976) (“nothing will be included in the grant except what is granted expressly or by clear implication”). Here, the NRA never voted for the developer’s proposed resolution. The only clear implication that can be gleaned from the minutes is that the parties were still negotiating and had not worked out the critical issue of price, an issue that became increasingly difficult after HUD rejected the concept of an “as is” appraisal.
The defendant also argues that HUD approval— even if legally required by the statutes and regulations — did not affect the binding nature of the contract between the NRA and the developer. This argument, however, is wrong for at least two reasons. First, as previously discussed, the HUD Handbook land disposition approval requirements are best considered as incorporated into the contract. Second, this argument has been rejected in the context of urban renewal contracts when a local renewal authority contracts with a developer in contravention of applicable federal or state regulations. See Brookline v. Brookline Redevelopment Authority, 344 Mass. 562, 570-73 (1962). The federal approval procedures, particularly when it comes to substantive contract alternations that propose a greatly reduced sales price, are designed — to quote the Supreme Judicial Court in a different but related context — "to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally." Phipps Products Corp. v. MBTA, 387 Mass. 686, 692 (1982).
The later passage of the Cranston-Gonzalez National Affordable Housing Act, 42 U.S.C. §12701 does not change this analysis. That federal enactment shifted the recipient of any surplus urban renewal proceeds from HUD to the local municipality. The public interest in maximizing the sale price of the parcel and/or ensuring a beneficial use for the public remains. The public interest simply shifts from the federal to the local level. Nothing in the Act suggests that a developer is to be benefitted by obtaining valuable land at a discount price.
SOME FINAL OBSERVATIONS
A judge need not be blind. As was evidenced by the crowded hearing on the motion, this lawsuit is of great local interest. There may exist many strongly held views on the fate of this waterfront parcel. This is as it should be in a vibrant democracy. But, none of these social or political matters concern this Court or influence this decision. Confronted in these motions, a judge only has the rather dry task of interpreting contractual provisions in accordance with the law and equity.
In this case, the defendant easily could have obtained a binding contract had it simply agreed to the federally required provisions. Instead, the developer consciously chose to reach for a more advantageous deal. At the time, the NRA was closely aligned with the developer’s wishes. There is nothing wrong with trying to bargain for a good deal but one must accept the risk of rejection. Here, the deal was so advantageous to the developer that it was rejected by HUD as contrary to the public interest. This process took time and the sand began to shift under the developer’s feet. As any sophisticated developer dealing -with public entities knows, a public body may begin to change its views in light of changed circumstances and public opinion. To paraphrase Justice Holmes, not only is it necessary to turn square comers when dealing with the government, it is also wise to turn them promptly.
CONCLUSION
For the reasons stated above, the plaintiff Newburyport Redevelopment Authority’s motion for summary judgment is ALLOWED as to Count I. The remaining Counts set forth in the Amended Complaint (Counts II through V) appear to be moot as this court has held that the land disposition agreement is not enforceable. The defendant’s motion for summary *689 judgment as to Count I is DENIED. This Court’s holding also necessarily disposes of Counts II, III, IV, V, VI, X, XI, and XII of the defendant’s Counterclaims. This is because each of those Counts seek enforcement of particular provisions of the land disposition agreement which has been held invalid.[12]
A judgment must enter for the plaintiff Newburyport Redevelopment Authority on these counterclaims. However, Counts VII, VIII, IX and XIII of the Counterclaims are not affected by this Court’s decision. Those Counts assert the defendant has certain rights under the Fourth Amendment of the Letter of Intent. Counts X3V through XVI also remain pending in that they seek damages on theories of promissory estoppel, quantum'meruit and reliance.

 The land in question actually consists of parcels 3-C1 and 3-C2 of the Newburport Urban Renewal Plan. For the purposes of this memorandum the land will simply be referred to as the parcel.

 The Redevelopment Authority solicitation for bids made it clear that the federal urban renewal plan for Newburyport governed the development of the waterfront parcel and that the Redevelopment Authority was prepared to "negotiate a price for the land in accordance with applicable state and federal law.” See Exhibit 7 to Defendant’s Compendium of Exhibits (pages 7 and 15).

 The terminology of urban redevelopment — like so much in law — quickly becomes arcane. For the sake of clarity, this court will use the word “developer” or “proposed developer” instead of “redeveloper.”

 The plaintiff is not contesting this assignment in this lawsuit.

 As is required by the HUD regulations, the contract (with the notable exception of the rider) was a form contract approved by HUD. See HUD Handbook, Chapter 4, ¶43 (p. 22) (Exhibit 2 in Plaintiffs Appendix). That regulation mandates that sales of project land (having a resale value of $60,000) must use standard HUD form contract number HUD-6209, more particularly Part I and Part II of the Contract for Sale of Land (Forms 6209A and 6290B respectively). The parties utilized these two forms, although numerous portions were excised or modified. No one disputes that the value of the parcel clearly exceeded $60,000.

 The proposed contract, containing the rider favorable to the developer, was drafted by developer’s counsel and forwarded to counsel for the Redevelopment Authority on August 26, 1988. There is no evidence submitted by either side that this initial draft was altered in any way before it was executed April 12, 1990.

 By April 1990, the necessary zoning and Chapter 2 IE approvals had been obtained. The MEPA process was not complete. The land was to be transferred after all the approvals were obtained.

 This letter noted that the developer was awaiting HUD approval of the modifications to the standard HUD form contracts. That approval was never forthcoming. See LaPlante letter dated November 6, 1990.

 The parties press a host of other claims not directly covered by this motion. For example, the plaintiff Redevelopment Authority seeks other declaratory relief in the event the contract is enforceable. The defendant also presses other claims — some based upon the contract and others based on other theories — none of which it now seeks a summary judgment upon. These counterclaims include claims for both equitable and monetary relief. On certain of the counterclaims a jury trial is claimed.

 At the hearing on this motion, the defendant asserted that no genuine issues of fact existed on either motion. The plaintiff argued that certain issues of fact might exist regarding defendant’s cross-motion if this Court went beyond the record of minutes and resolutions to gauge the NRA’s intent. This the Court will not, and should not, do. Charles River Park, Inc. v. Boston Redevelopment Authority, 28 Mass.App.Ct. 795, 808 (1990) (and cases cited therein). The defendant does press an estoppel claim. This claim might involve certain factual disputes and, thus, will not be resolved within the context of this motion. There is, however, impressive authority for the position that estoppel does not, as a matter of law, apply against governmental agencies or public entities. Phipps Products Corp. v. Massachusetts Bay TransportationAuthority, 387 Mass. 687, 693-94 (1982); Harrington v. Fall River Housing Authority, 27 Mass.App.Ct. 301, 308-10 (1989). See also Heckler v. Community HealthServs., Inc., 467 U.S. 51, 63-64, 66 (1984).

 Even had the Redevelopment Authority approved such an amendment it is highly unlikely that it would have complied with the HUD requirements as indicated in the November 7, 1990 letter from Nancy LaPlante at HUD.

 To the extent Count III seeks enforcement of the Letter of Intent, it is duplicative of Count XIII.